# United States Court of Appeals
## for the First Circuit

No. 21-1303

BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,
*Plaintiff-Appellant*,

*v.*

THE SCHOOL COMMITTEE OF THE CITY OF BOSTON; ALEXANDRA OLIVER-DAVILA;
MICHAEL O'NEIL; HARDIN COLEMAN; LORNA RIVERA; JERI ROBINSON;
QUOC TRAN; ERNANI DEARAUJO; AND BRENDA CASSELLIUS,
*Defendants-Appellees*;

THE BOSTON BRANCH OF THE NAACP; THE GREATER BOSTON LATINO NETWORK;
ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK;
ASIAN AMERICAN RESOURCE WORKSHOP; MAIRENY PIMENTEL; H.D.,
*Defendants-Intervenors-Appellees*.

*(For continuation of caption, see inside cover.)*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF MASSACHUSETTS, CALIFORNIA, COLORADO,
THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE,
MARYLAND, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK,
OREGON, PENNSYLVANIA, RHODE ISLAND, AND WASHINGTON AS
*AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

MAURA HEALEY
*Attorney General of Massachusetts*
Elizabeth N. Dewar, 1st Cir. No. 1149723
*State Solicitor*
Ann E. Lynch
David Ureña
*Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2204
bessie.dewar@mass.gov

*(Additional counsel on signature pages.)*

———————————————

No. 22-1144

———————————————

BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,
*Plaintiff-Appellant*,

*v.*

THE SCHOOL COMMITTEE OF THE CITY OF BOSTON; ALEXANDRA OLIVER-DAVILA;
MICHAEL O'NEILL; HARDIN COLEMAN; LORNA RIVERA; JERI ROBINSON;
QUOC TRAN; ERNANI DEARAUJO; AND BRENDA CASSELLIUS, SUPERINTENDENT OF
THE BOSTON PUBLIC SCHOOLS,
*Defendants-Appellees*;

THE BOSTON BRANCH OF THE NAACP; THE GREATER BOSTON LATINO NETWORK;
ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK;
ASIAN AMERICAN RESOURCE WORKSHOP; MAIRENY PIMENTEL; H.D.,
*Defendants-Intervenors-Appellees*.

———————————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTERESTS OF *AMICI* .................................................................................... 1

ARGUMENT ..................................................................................................... 4

    I.    Race-Neutral Policies Are Not Subject to Strict Scrutiny
        Simply for Aiming in Part to Increase Diversity. .................................. 5

    II.   Adopting the Plaintiff's Theory Risks Imposing Drastic and
        Far-Reaching Consequences. ............................................................. 13

        A.    Inferring Animus from Efforts to Increase Racial and
              Other Forms of Diversity Would Thwart Almost Any
              Means of Attempting to Secure Important Educational
              Benefits for All Students............................................................ 14

        B.    The Plaintiff's Theory Also Threatens to Impede
              Effective Governmental Decision-Making in the Many
              Realms in Which Policymakers Necessarily Are Aware
              of and Consider Policies' Impact Across Racial Groups.......... 22

CONCLUSION .................................................................................................. 27

CERTIFICATES OF COMPLIANCE AND SERVICE ......................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson ex rel. Dowd v. City of Boston*,
  375 F.3d 71 (1st Cir. 2004) ...................................................................... 2, 4, 8-9

*Bethune-Hill v. Virginia State Bd. of Elections*,
  137 S. Ct. 788 (2017) ...................................................................................... 14

*Boston Parent Coal. for Acad. Excellence v. City of Boston*,
  996 F.3d 37 (1st Cir. 2021) ................................................................................ 5

*Christa McAuliffe Intermediate School PTO, Inc. v. De Blasio*,
  64 F. Supp. 3d 253 (S.D.N.Y 2019) ................................................................ 21

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ........................................................................................ 11

*Coal. for TJ v. Fairfax Cty. Sch. Bd.*,
  No. 21-296, 2022 WL 579809 (E.D. Va. Feb. 25, 2022) .................................. 12

*Columbus Bd. of Educ. v. Penick*,
  443 U.S. 449 (1979) ........................................................................................ 10

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011) ......................................................................... 7, 10

*Fisher v. Univ. of Texas at Austin*,
  570 U.S. 297 (2013) ..................................................................................... 8, 22

*Fisher v. Univ. of Texas at Austin*,
  579 U.S. 365 (2016) ........................................................................................ 22

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ................................................................................. *passim*

ii

*Lewis v. Ascension Parish Sch. Bd.*,
    806 F.3d 344 (5th Cir. 2015)................................................................ 10

*Parents Involved in Community Schools v. Seattle School District No. 1*,
    551 U.S. 701 (2007).................................................................2, 7-8, 21

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1975)..................................................................6-7, 12

*Regents of University of California v. Bakke*,
    438 U.S. 265 (1978) ................................................................ 4, 8, 14

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ........................................................................ 11

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) .......................................................................... 1

*Shaw v. Reno*,
    509 U.S. 630 (1993) ........................................................................ 14

*Spurlock v. Fox*,
    716 F.3d 383 (6th Cir. 2013)................................................ 10, 13, 26

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*,
    576 U.S. 519 (2015) ................................................................ 7, 12, 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..............................................................6, 12-14

*Washington v. Davis*,
    426 U.S. 229 (1976) ........................................................................ 22

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. XIV, § 1 ..........................................................*passim*

Exec. Order No. 13995, 86 C.F.R § 7193 ................................................ 24

Fed. R. App. P. 29(a)(2) .......................................................................... 1

**Miscellaneous**

Frances E. Aboud *et al.*, *Cross-race Peer Relations and Friendship Quality*,
   27 Int'l J. Behav. Dev. 165 (2003) ................................................. 17-18

Nicholas A. Bowman, *College Diversity and Cognitive Development: A
   Meta-Analysis*, 80 Rev. Educ. Rsch. 4 (Mar. 2010) ........................... 15

Cambridge Public Schools, *About Controlled Choice* (2022) ................. 21

Cambridge Public Schools, *Controlled Choice Plan* (Nov. 2013) ........... 21

CBS-New York, *COVID Vaccine: 2 New Sites for Underserved
Communities Opening In New York City* (Feb. 10, 2021) ...................... 25

CDC, *COVID-19 Weekly Cases and Deaths per 100,000 Population by Age,
   Race/Ethnicity, and Sex* ...................................................................... 23

CDC, *Minority Health Social Vulnerability Index Overview* (Nov. 19, 2021) ...... 25

College Board, *AP Cohort Data Report: Graduating Class of 2021* (2022) ........ 20

Committee on Social Science Research Evidence on Racial Diversity in
   Schools, National Academy of Education, *Race-Conscious Policies for
   Assigning Students to Schools: Social Science Research and the Supreme
   Court Cases* (2007) ............................................................................. 16

Kristen Davies *et al.*, *Cross-Group Friendships and Intergroup Attitudes: A
   Meta-Analytic Review,* 15 Personality & Soc. Psychol. Rev. 332 (2011) ........... 17

iv

Leslie Echols & Sandra Graham, *Meeting in the Middle: The Role of Mutual Biracial Friends in Cross-Race Friendships*, 91 Child Dev. 401 (2020) ................................................................ 17

Helene Gayle *et al.*, *Framework for Equitable Allocation of COVID-19 Vaccines*, National Academies of Sciences, Engineering, and Medicine (2020) .................................................................. 23

Pat Rubio Goldsmith, *Learning Apart, Living Apart: How the Racial and Ethnic Segregation of Schools and Colleges Perpetuates Residential Segregation*, 112 Tchrs. C. Rec. 1602 (Jun. 2010) .......................... 19

Sandra Graham, *Race/Ethnicity and Social Adjustment of Adolescents: How (Not If) School Diversity Matters*, 53 Educ. Psych. 64 (2018) .................. 17

Lynette Guastaferro, *Why Racial Inequities are Rooted in Housing Policies*, USA Today (Nov. 2, 2020) ................................................. 20

Maureen T. Hamilton & Steven S. Smith, *The Effects of Classroom Racial Composition on Students' Interracial Friendliness*, 48 Soc. Psychol. Q. 3 (1985) .............................................................. 18

Latoya Hill & Samantha Artiga, *COVID-19 Cases and Deaths by Race/Ethnicity: Current Data and Changes Over Time*, Kaiser Family Foundation .............................................................. 24

Rucker C. Johnson, *Long-Run Impacts of School Desegregation & School Quality on Adult Attainments* 2, 19-21, 23-24 (Nat'l Bureau of Econ. Rsch., Working Paper No. 16664, 2015) .......................................... 16

Jennifer C. Kerr, *Report Finds Segregation in Education on the Rise*, AP News (May 17, 2016) ............................................................ 20

Melanie Killen *et al.*, *Reducing Prejudice Through Promoting Cross-Group Friendships*, Rev. Gen. Psych. 1 (2021) .......................................... 17

Michal Kurlaender & John T. Yun, *Fifty years after Brown: New Evidence of the Impact of School Racial Composition on Student Outcomes*, 6 Int'l J. Educ. Pol'y & Rsch. Practice 51 (2005) ........................................................ 19

Michal Kurlaender & John T. Yun, *Measuring School Racial Composition and Student Outcomes in a Multiracial Society*, 113 Am. J. Educ. 213 (2007) .................................................................................... 19

Sarah A. Lister *et al.*, *Health Equity and Disparities During the COVID-19 Pandemic: Brief Overview of the Federal Role*, Cong. Rsch. Serv., R46861 (2021) ............................................................. 24

Shizhu Liu *et al.*, *Cross-race and Cross-ethnic Friendships and Psychological Well-Being Trajectories Among Asian American Adolescents: Variations by School Context*, 65 Developmental Psych. 2121 (2020) ............................... 17

Massachusetts Department of Public Health, *Baker-Polito Administration Launches Targeted Outreach Initiative in 20 Hardest Hit Communities to Increase Equity in COVID-19 Vaccine Awareness and Access; $1M to Support Vaccination in Historically Underserved Communities* (Feb. 16, 2021) ...................................................................... 23

Roslyn Arlin Mickelson & Mokubung Nkomo, *Integrated Schooling, Life Course Outcomes, and Social Cohesion in Multiethnic Democratic Societies*, 36 Rev. Rsch. Educ. 197 (2012) ........................................ 15-16, 18-19

Ashley B. Mikulyuk & Jomills H. Braddock, II, *K-12 School Diversity and Social Cohesion: Evidence in Support of a Compelling State Interest*, 50 Educ. & Urban Soc'y 5 (2018) ........................................................ 18

Benjamin Mueller, *In Rural America, Covid Hits Black and Hispanic People Hardest*, N.Y. Times (July 28, 2022) ................................................. 23

NBC New York, *Vaccine Appointments Open for Underserved Zip Codes in Queens, Brooklyn at NY-FEMA Sites* (Feb. 20, 2021) ........................................ 25

Nambi Ndugga *et al.*, *Early State Vaccination Data Raise Warning Flags for Racial Equity*, Kaiser Family Foundation (Jan. 21, 2021)................................. 24

Nambi Ndugga *et al.*, *How are States Addressing Racial Equity in COVID-19 Vaccine Efforts?*, Kaiser Family Foundation (Mar. 10, 2021) ........................... 25

New York City Department of Education, Diversity in Admissions (2022).......... 21

Adrienne Nishina *et al.*, *Ethnic Diversity and Inclusive School Environments*, 54 Educ. Psychologist 306 (2019) ...................................................... 16

Gregory J. Palardy, *High School Socioeconomic Segregation and Student Attainment*, 50 Am. Educ. Rsch. J. 714 (Aug. 2013).......................................... 16

Thomas F. Pettigrew & Linda R. Tropp, *A Meta-analytic Test of Intergroup Contact Theory*, 90 J. Personality & Soc. Psychol. 751 (May 2006)............ 17-18

Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Allocation of $15 Million to Promote Vaccinations in Communities Disproportionately Affected by COVID-19 Pandemic (July 26, 2021) ...................................................................... 25

Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Partnership with SOMOS Community Care to Vaccinate Underserved New Yorkers for COVID-19 at Community Medical Practices (Mar. 26, 2021)............................................................. 25-26

Igor Ryabov, *Adolescent Academic Outcomes in School Context: Network Effects Reexamined*, 34 J. Adolescence 915 (2011) ...................................... 15-16

Kenneth Shores *et al.*, *Categorical Inequalities Between Black and White Students are Common in US Schools—But They Don't Have to Be*, Brookings Institute (Feb. 21, 2020) .................................................... 20

Adelle Simmons *et al.*, *Health Disparities by Race and Ethnicity During the COVID-19 Pandemic: Current Evidence and Policy Approaches*, U.S. Dep't of Health & Hum. Serv., Off. of the Assistant Sec'y for Plan. & Evaluation (Mar. 16, 2021) ................................................................ 24

Spectrum News 1, *Bringing the Vaccine—and Reassurance—to Underserved Populations* (July 1, 2021) ................................................................ 25

Elizabeth Stearns *et al.* *Interracial Friendships in the Transition to College: Do Birds of a Feather Flock Together Once They Leave the Nest?*, 82 Soc. Educ. 173 (2009) ................................................................ 18

Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition: Perpetuation Theory Reexamined*, 112 Tchrs. C. Rec. 1654 (Jun. 2010) .......... 19

Tracy Swartz, *Can Selective Enrollment in Chicago Public Schools be Fairer? Proposed Changes Aim to Make Admissions More Equitable: 'It's a Touchy Subject'*, Chicago Tribune (Mar. 11, 2022) ....................................................... 21

U.S. Gov't Accountability Off., GAO-22-104737, *K-12 Education: Student Population Has Significantly Diversified, But Many Schools Remain Divided Along Racial, Ethnic, and Economic Lines* (Jun. 2022) ...................... 19

# INTERESTS OF *AMICI*

Massachusetts, California, Colorado, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, and Washington submit this brief as *amici curiae* under Fed. R. App. P. 29(a)(2) to urge this Court to dismiss this appeal as moot or, if it reaches the merits, to reject the Boston Parent Coalition for Academic Excellence Corporation's ("BPCAEC") challenge to the City of Boston's now-superseded, temporary plan for admitting students to the City's "exam" schools amidst the disruptions of the COVID-19 pandemic. Contrary to decades of Supreme Court precedent, BPCAEC argues that strict scrutiny should apply to a public school's race-neutral admissions plan—and, in fact, any government action—whenever policymakers pursue greater diversity, including racial diversity, in forming a policy: An intent to increase access for underrepresented groups, BPCAEC asserts, necessarily implies an intent to decrease access for others. BPCAEC Br. 52-53. BPCAEC further argues that diversity in public K-12 education is not a compelling governmental interest. *See* BPCAEC Br. 54-56. These notions threaten the States' interest in ensuring our public schools equitably and effectively serve all our students.

Our States have a compelling interest in eradicating race discrimination in all its forms. *Roberts v. United States Jaycees*, 468 U.S. 609, 628 (1984). The

States also share a compelling interest in ensuring that our students receive the educational benefits that flow from diversity in our schools, including racial diversity. *Grutter v. Bollinger*, 539 U.S. 306, 328-33 (2003). As discussed further below, "numerous studies show that student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society[.]" *Id.* at 330 (quotation omitted).

BPCAEC's theory in this case would undermine these compelling interests by effectively precluding state and local governments from working to break down barriers to access to high-quality schools and to ensure our students receive the educational benefits flowing from racial and other forms of diversity. This case does not concern a policy that takes an applicant's race into account in the admissions process in any way; no student will be admitted, or rejected, under the City's policy "on the basis of individual racial classifications" of the kinds the Supreme Court has held require strict scrutiny, *see Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007). Instead, the City employed precisely the kind of race-neutral policy that courts have long subjected only to rational basis review, *see Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 90 (1st Cir. 2004), and that the Supreme Court has indeed *encouraged* the States to pursue as an alternative to race-conscious measures, *see, e.g.*, *Grutter*, 539 U.S. at 342. Yet, under BPCAEC's theory, any such race-neutral

admissions policy must be subject to strict scrutiny simply if some policymakers' aims in designing it included increasing the racial diversity of the school's student body, because "the intent to *increase* the representation of certain racial groups by necessity implies intent to *decrease* representation of the remaining groups."  Br. 52 (quotation omitted).  Under this deeply flawed reasoning, governmental educational institutions may never design a race-neutral admissions policy that in part aims to increase racial and other forms of diversity without facing strict scrutiny, because in schools with fixed numbers of seats, any increase in racial diversity necessarily entails a reduction in representation from at least one other racial group.

Indeed, the implications of BPCAEC's arguments sweep yet more broadly, threatening our States' ability to engage in sound policymaking and governance in critical areas at the core of our police powers.  As discussed further below, many aspects of government policymaking involve allocating finite resources analogous to a sought-after placement at a particular school.  In allocating such resources, policymakers frequently must ensure that resources are deployed effectively across a host of dimensions, to people from every corner of our jurisdictions: people of varying socioeconomic status; people living in urban, suburban, and rural communities; people with and without disabilities; people of all ages; and people from diverse racial, ethnic, and language communities.  And policymakers are

often faced with the reality that preexisting policies may not provide adequate access to programs and benefits for particular communities, in some cases because the policies themselves impose unnecessary or arbitrary barriers to access. Yet under BPCAEC's suggested reasoning, a policy would be subject to strict scrutiny any time policymakers considered the impact potential race-neutral policy changes might have across various communities. The result would be perverse: governments would be severely constrained in their ability to serve *all* of their communities—and therefore would fall short for many.

The *Amici* States engage in numerous such race-neutral efforts to ensure our limited resources are effectively and equitably deployed across our jurisdictions, in realms ranging from education to public health. We thus urge this Court to reject the unfounded, illogical, and destructive notion that any race-neutral state policy must be subject to strict scrutiny simply because policymakers aimed to foster greater diversity, break down barriers to access, or avoid arbitrary exclusion.

## **ARGUMENT**

As this Court recognized in *Anderson ex rel. Dowd v. City of Boston*, citing decades of precedent stretching back to *Regents of University of California v. Bakke*, 438 U.S. 265, 311-12 (1978), "the mere invocation of racial diversity as a goal is insufficient to subject [a facially race-neutral school selection plan] to strict scrutiny." 375 F.3d at 87 & n.17. To hold otherwise would be to declare "that any

attempt to use neutral criteria to enhance diversity—not just measures aimed at achieving a particular racial balance—would be subject to strict scrutiny." *Boston Parent Coal. for Acad. Excellence Corp. v. City of Boston*, 996 F.3d 37, 48 (1st Cir. 2021).

Accordingly, if the Court reaches the merits of this dispute rather than dismissing on mootness grounds, the Court should reaffirm its rejection of BPCAEC's theory and the profound negative consequences that theory would entail. Most obviously, it would prevent the use of even race-neutral means for ensuring students receive the educational benefits that flow from a diverse student body. And beyond the realm of education, BPCAEC's theory threatens to constrain governmental policymakers as they determine how best to allocate many other kinds of benefits and burdens; it would potentially subject race-neutral policies to strict scrutiny whenever policymakers choose a policy in part to ensure that resources reach, or burdens do not disproportionately fall upon, communities heretofore underserved or overburdened. The Equal Protection Clause should not and cannot be understood to preclude government from working to serve all people.

## I.     Race-Neutral Policies Are Not Subject to Strict Scrutiny Simply for Aiming in Part to Increase Diversity.

There is no basis in this Court's or the Supreme Court's precedent for the notion that strict scrutiny must be applied if policymakers considered the interests

of racial diversity, among other interests, in devising a race-neutral policy.  To the contrary, courts around the country have joined this Court in upholding precisely these kinds of race-neutral policies that aim to distribute benefits and burdens equitably across and within our States' diverse communities.

Under long-established doctrine, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" where a race-neutral government action "results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). The Supreme Court requires proof of discriminatory intent before applying strict scrutiny in part because it understands that legislators and administrators are "properly concerned with balancing numerous competing considerations" when governing.  *Id.* at 264-65.

Any contention that strict scrutiny should apply to a facially race-neutral law or policy because of invidious discriminatory intent or purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent." *Id.* at 266. Importantly here, a discriminatory purpose "implies more than intent as volition or intent as awareness of consequences."  *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1975).  Instead, a discriminatory purpose requires "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

6

group." *Id.* Thus, even if a decisionmaker is aware of potential "adverse effects" of a facially neutral policy on a given racial group, that is not alone sufficient evidence that the decisionmaker acted with a discriminatory purpose. *See id.* Rather, the plaintiff must demonstrate an "invidious discriminatory purpose" to impose those adverse effects. *Id.*

As this Court recognized in denying BPCAEC's motion for an injunction pending appeal, the Supreme Court "has never held that strict scrutiny should be applied to a school plan in which race is not a factor merely because the decisionmakers were aware of or considered race when adopting the policy." 996 F.3d at 49 (quoting *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011)). Rather, "it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body," in order to "bring[] together students of diverse backgrounds and races through other means," like "drawing attendance zones with general recognition of the demographics of neighborhoods." *Parents Involved*, 551 U.S. at 788-89 (Kennedy J., concurring); *accord Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 545 (2015) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means [than explicitly considering race], including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods." (quoting

7

*Parents Involved*, 551 U.S. at 789 (Kennedy J., concurring))).  Strict scrutiny does not apply in such cases, because legislators should not be precluded from considering "the impact a given approach might have on students of different races."  *Parents Involved*, 551 U.S. at 789 (Kennedy J., concurring)

     Far from applying strict scrutiny to race-neutral admissions policies, the Supreme Court has actually encouraged race-neutral policies as an alternative to race-conscious means of achieving "a diverse student body," which is "clearly [] a constitutionally permissible goal" due to its recognized educational benefits. *Bakke*, 438 U.S. at 311-12.  In the context of higher education, the Supreme Court has invited jurisdictions to "draw on the most promising aspects of . . . race-neutral alternatives" being tested in some states "to achieve student body diversity." *Grutter*, 539 U.S. at 342.  It follows that such race-neutral policies aiming to increase diversity are not constitutionally suspect.  *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013) (universities must engage in "'serious, good faith consideration of workable race-neutral alternatives'" to "produce the educational benefits of diversity" (quoting *Grutter*, 539 U.S. at 339)); *id.* at 333 (Thomas, J., concurring) (noting "blacks and Hispanics attending the University were admitted without discrimination under the Top Ten Percent plan").

     Accordingly, this Court has previously declined to apply strict scrutiny where a facially race-neutral school-assignment plan sought to maintain diversity

and was drafted with an awareness of racial demographic data. In *Anderson*, the Court upheld "a racially neutral assignment system that was designed to maximize, not minimize, equitable distribution of seats in the public schools" in Boston through a more limited degree of "walk zone" priority for school admissions. 375 F.3d at 85. The challenged plan allocated only 50% (rather than the prior 100%) of seats based on students' walking-distance proximity to schools in an effort to address inequities created by the fact that some neighborhoods were over-served with the number of available seats for schools within walking distance, others were under-served, and some students had no schools whatsoever within walking distance. *Id.* at 80-82. This Court rejected the plaintiffs' argument that the plan should be subjected to strict scrutiny simply because, in the wake of a federal court ruling requiring the school district to cease use of race-conscious means of ensuring diversity in the city's schools, the Superintendent and School Committee had pursued "diversity as one of the several goals" of the new race-neutral student assignment system—a commitment which the plaintiffs in that case, like BPCAEC here, "equate[d] . . . with an illegitimate commitment to racial balancing." *Id.* at 85. Rather, the Court observed, an intent to "increas[e] minority participation and access is not suspect," and "the mere invocation of racial diversity as a goal is insufficient to subject [a facially race-neutral school selection plan] to strict scrutiny." *Id.* at 87; *accord BPCAEC*, 996 F.3d at 46.

9

Courts around the country have joined this Court in reaching the same conclusion.  In *Spurlock v. Fox*, for example, the Sixth Circuit rejected claims that a school-assignment plan employed racial classifications requiring strict scrutiny or evinced a discriminatory purpose simply "because its drafters 'made use of detailed racial and ethnic data throughout the process of development,'" in adopting "measures that would have the least possible effect on increasing racial isolation and exacerbating the racial achievement gap."  716 F.3d 383, 394, 399 (6th Cir. 2013).  As the court there noted, "[t]he claim that considering demographic data amounts to segregative intent flies in the face of the Supreme Court's holding that 'disparate impact and foreseeable consequences, without more, do not establish a constitutional violation.'"  *Id.* at 398 (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979)).  Similarly, in *Lewis v. Ascension Parish School Board*, 806 F.3d 344, 356-58 (5th Cir. 2015), the Fifth Circuit held that school plans that decisionmakers draft with consideration of racial demographics, but that do not contain express racial classifications, are facially neutral and not subject to strict scrutiny absent evidence of discriminatory purpose. And in *Doe v. Lower Merion School District*, 665 F.3d at 545-48, the Third Circuit declined to apply strict scrutiny to a race-neutral school redistricting plan on the basis of racial classification or discriminatory purpose simply because decisionmakers had drafted it with an awareness of race.

10

The Supreme Court has also declined to apply strict scrutiny to facially race-neutral laws in other contexts on the basis that the government aimed to increase diversity or considered the impact the policy would have on different racial groups. Instead, the Court has expressly supported the use of race-neutral tools to remove barriers to access that may disproportionately affect underrepresented racial groups. In the contracting context, for example, the Court has noted that, if minority business enterprises "disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, a fortiori, lead to greater minority participation." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509-10 (1989); *see also id.* at 526 (Scalia, J., concurring) ("A state can act to undo the effects of past discrimination [in state contracting] [by] adopt[ing] a preference for small businesses, or even new businesses—which would make it easier for those previously excluded by discrimination to enter the field."). In the employment context, the Supreme Court has not "question[ed] an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the [promotion] process." *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009). And in the housing context, the Supreme Court held that "local housing authorities may choose to foster diversity and combat racial isolation with race-neutral tools, and mere awareness of race in attempting to solve the problems facing inner cities does

not doom that endeavor at the outset." *Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 545.

BPCAEC's theory is thus incompatible with decades of precedent. BPCAEC asserts that strict scrutiny must apply here because "the intent to *increase* the representation of certain racial groups 'by necessity' implies intent to *decrease* representation of the remaining groups." Br. 52 (quoting *Coal. for TJ v. Fairfax Cty. Sch. Bd.*, No. 21-296, 2022 WL 579809, at *6 (E.D. Va. Feb. 25, 2022), *stayed pending appeal*, No. 12-1280, 2022 WL 986994 (4th Cir. Mar. 31, 2022)). The phrase "by necessity" starkly exemplifies a fundamental error in BPCAEC's analysis.[1]  The referenced "necessity"—that, for schools with a fixed number of students, a race-neutral policy change that operates to expand access to and increase representation of underrepresented groups will concomitantly diminish representation from other groups—is only a mathematical fact, not

---

[1] This is not to mention numerous other errors in the plaintiff's analysis. For example, as this Court noted in denying BPCAEC's request for an injunction pending appeal, this temporary race-neutral plan certainly did not produce the kind of "stark" racial disparity that the Supreme Court has held may sometimes alone support an inference of discriminatory intent, *Arlington Heights*, 429 U.S. at 266. *See* 996 F.3d at 50 (observing that the temporary race-neutral policy's "result on its face manifested no starkly disparate impact concerning which plaintiff can complain," and that "[t]o find such conduct subject to strict scrutiny would render any school admissions criteria subject to strict scrutiny if anyone involved in designing it happened to think that its effect in reducing the underrepresentation of a group was a good effect").

discriminatory animus. *See Feeney*, 442 U.S. at 279. Such a mathematical fact—the relative reduction in representation of one group that comes with an increase in representation of another—exists *whenever* policymakers seek to reallocate limited resources to address an inequity or arbitrary barrier they have identified. It is precisely to avoid paralyzing lawmakers when they are making such choices and "balancing numerous competing considerations" that the longstanding *Arlington Heights* framework requires additional evidence to show discriminatory animus, 429 U.S. at 265—not mere awareness of racial demographic data. *See Spurlock*, 716 F.3d at 394-95 ("Racial classification requires more than the *consideration* of racial data"; "the requirement that legislative classifications be color-blind does not demand demographic ignorance during the policymaking process.").

This Court should therefore reject BPCAEC's attempt to "doom . . . at the outset" race-neutral policies aiming to foster racial and other forms of diversity. *Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 545.

## II. Adopting the Plaintiff's Theory Risks Imposing Drastic and Far-Reaching Consequences.

The notion that a race-neutral policy aiming in part to increase diversity necessarily amounts to invidious race discrimination not only is unfounded in our constitutional jurisprudence, but also threatens sweeping and pernicious consequences if adopted. Such a theory would greatly hinder policymakers in aiming to ensure students' access to the long-recognized educational benefits that

13

flow from racial and other forms of diversity amongst their peers.  It also could tie policymakers' hands in matters extending well beyond the context of diversity in education.  There are numerous areas in which policymakers are and must be "'aware of race . . . just as [they are] aware of . . . a variety of other demographic factors'" when they make decisions.  *Bethune-Hill v. Virginia State Bd. Of Elections*, 137 S. Ct. 788, 797 (2017) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)).  Yet BPCAEC's theory would potentially require strict scrutiny any time policymakers change a policy to ensure that benefits and burdens are distributed more effectively and equitably across our communities, because such changes "by necessity" arguably adversely affect any group that received a greater share of the benefit or a lesser burden under the status quo.

### A.    Inferring Animus from Efforts to Increase Racial and Other Forms of Diversity Would Thwart Almost Any Means of Attempting to Secure Important Educational Benefits for All Students.

BPCAEC's erroneous "by necessity" basis for imputing discriminatory animus under *Arlington Heights* would imperil race-neutral efforts to secure for students the educational benefits that flow from engaging with peers from diverse backgrounds, from elementary school through graduate school.  The Supreme Court has long recognized these educational benefits in the context of higher education, *see, e.g.*, *Bakke*, 438 U.S. at 312-14 & n.48; *Grutter*, 539 U.S. at 330-33, and the evidence has only grown that diversity in colleges and universities

benefits students' development.[2]  So too in K-12 education, where "integrated education is positively related to K-12 school performance, cross-racial friendships, acceptance of cultural differences, and declines in racial fears and prejudice,"[3] and leads to "improved long-term outcomes: higher educational and occupational attainment across all ethnic groups, better intergroup relations, greater likelihood of living and working in an integrated environment, lower likelihood of involvement with the criminal justice system, espousal of democratic values, and greater proclivity for aspects of civil engagement."[4]  These benefits, both short- and long-term, fall into three broad categories—academic, social, and civic—and all are threatened by BPCAEC's theory here.

First, students who attend a diverse K-12 school enjoy numerous academic benefits.  For example, increased diversity in school generally improves students' grades,[5] and the racial composition of the school a student attends is also a

---

[2] *See, e.g.*, Nicholas A. Bowman, *College Diversity and Cognitive Development: A Meta-Analysis*, 80 Rev. Educ. Rsch. 4, 12, 14, 17-18 (Mar. 2010) (meta-analysis including studies of 77,029 undergraduate students finding a positive relationship between college diversity experiences and cognitive development, including gains in complex thinking and problem-solving skills).

[3] Roslyn Arlin Mickelson & Mokubung Nkomo, *Integrated Schooling, Life Course Outcomes, and Social Cohesion in Multiethnic Democratic Societies*, 36 Rev. Rsch. Educ. 197, 208 (2012).

[4] *Id.*

[5] Igor Ryabov, *Adolescent Academic Outcomes in School Context: Network Effects Reexamined*, 34 J. Adolescence 915, 923 (2011).

"significant predictor of high school graduation."[6]  And these academic benefits yield long-term effects:  A longitudinal study that followed adults born between 1945 and 1968 found that Black adults who experienced desegregated schooling had higher occupational attainment, greater adult earnings, and better health outcomes as of 2013.[7]  Fostering diversity in K-12 schools matters because "the earlier that students experience desegregated learning environments, the greater the positive impacts on academic success."[8]

Second, diversity in K-12 schools also confers social benefits.  Students in more diverse classrooms report feeling safer, less picked-on, less lonely, and less socially anxious.[9]  Diversity benefits students' mental health and social

---

[6] Mickelson & Nkomo, *supra* note 3, at 212-213; *see also* Gregory J. Palardy, *High School Socioeconomic Segregation and Student Attainment*, 50 Am. Educ. Rsch. J. 714, 734 (Aug. 2013); Ryabov, *supra* note 5, at 924.

[7] Rucker C. Johnson, *Long-Run Impacts of School Desegregation & School Quality on Adult Attainments* 2, 19-21, 23-24 (Nat'l Bureau of Econ. Rsch., Working Paper No. 16664, 2015), https://tinyurl.com/4eptkb5a.

[8] Committee on Social Science Research Evidence on Racial Diversity in Schools, National Academy of Education, *Race-Conscious Policies for Assigning Students to Schools: Social Science Research and the Supreme Court Cases* 13-20 (2007), https://tinyurl.com/4udpw88c.

[9] Adrienne Nishina *et al.*, *Ethnic Diversity and Inclusive School Environments*, 54 Educ. Psychologist 306, 308 (2019) (citing studies including one of almost 2,000 sixth-grade students, another of more than 70 classrooms, and another of more than 4,000 students across 26 schools).

adjustment,[10] and cross-race friendships in particular promote psychological well-being.[11] Studies also suggest that contact between different groups produces improved intergroup relations,[12] and that cross-group friendships are associated with more positive intergroup attitudes and less prejudice.[13] "[B]eing engaged socially with many cross-race companions and having a high-quality [cross-race] friendship [i]s linked to unbiased attitudes."[14] And, perhaps unsurprisingly, being

---

[10] Sandra Graham, *Race/Ethnicity and Social Adjustment of Adolescents: How (Not If) School Diversity Matters*, 53 Educ. Psych. 64, 64, 70-71 (2018).

[11] Shizhu Liu *et al.*, *Cross-race and Cross-ethnic Friendships and Psychological Well-Being Trajectories Among Asian American Adolescents: Variations by School Context*, 65 Developmental Psych. 2121, 2121 (2020) (finding that "cross-race friendships promoted Asian American adolescents' psychological well-being, particularly in early adolescence").

[12] Kristen Davies *et al*., *Cross-Group Friendships and Intergroup Attitudes: A Meta-Analytic Review,* 15 Personality & Soc. Psychol. Rev. 332 (2011) (citing Thomas F. Pettigrew & Linda R. Tropp, *A Meta-Analytic Test of Intergroup Contact Theory*, 90 J. Personality & Soc. Psychol. 751-783 (2006)); *see also* Leslie Echols & Sandra Graham, *Meeting in the Middle: The Role of Mutual Biracial Friends in Cross-Race Friendships*, 91 Child Dev. 401, 413 (2020) (examining the mechanisms through which cross-racial friendships yield social benefits and finding that "biracial youth . . . serve as social bridges for cross-race friendships")

[13] Davies *et al.*, *supra* note 12, at 340, 345; Melanie Killen *et al.*, *Reducing Prejudice Through Promoting Cross-Group Friendships*, 26 Rev. Gen. Psych. 361 (2021) (discussing studies showing that "childhood is an ideal timeframe for reducing and combating intergroup bias" and that cross-race/ethnic friendships are "[o]ne of the most significant factors that contribute[s] to a reduction in prejudice, bias, and exclusionary attitudes and behavior").

[14] Frances E. Aboud *et al*., *Cross-race Peer Relations and Friendship Quality*, 27 Int'l J. Behav. Dev. 165, 172 (2003).

in a more diverse school results in more cross-racial friendships[15]—a benefit that

then continues through college and into adulthood.[16]

Third and relatedly, civil society benefits from diverse schools.  Because K-

12 diversity has been found to increase trust and connection between racial groups,

"greater diversity in schools is associated with higher levels of social cohesion

across U.S. communities."[17]  Social cohesion refers to "the aggregation of social

attitudes, norms, and behaviors that include trust, a sense of belonging, and

willingness to participate and help."[18]  In contrast, failure to promote diversity "can

result in community fragmentation"[19]:  A lack of diversity in teenagers' high

schools, often reflecting housing segregation in their neighborhood, is predictive of

---

[15] Mickelson & Nkomo, *supra* note 3, at 211 (citing Maureen T. Hamilton & Steven S. Smith, *The Effects of Classroom Racial Composition on Students' Interracial Friendliness*, 48 Soc. Psychol. Q. 3-16 (1985)); *see also* Aboud *et al*. *supra* note 14, at 166 (citing, *e.g.*, M.L. Clark & Marla Ayers, *Friendship Similarity During Early Adolescence: Gender and Racial Patterns*, 126 J. Psychol. 393-405 (1992)).

[16] Mickelson & Nkomo, *supra* note 3, at 218 (citing Pettigrew & Tropp, *supra* note 12, at 751-783, and Elizabeth Stearns *et al*., *Interracial Friendships in the Transition to College: Do Birds of a Feather Flock Together Once They Leave the Nest?*, 82 Soc. Educ. 173-195 (2009)).

[17] Ashley B. Mikulyuk & Jomills H. Braddock, II, *K-12 School Diversity and Social Cohesion: Evidence in Support of a Compelling State Interest*, 50 Educ. & Urban Soc'y 5, 28 (2018).

[18] *Id.* at 12.

[19] *Id.* at 30.

the degree of diversity in their college[20]; "high school composition [i]s a

significant and powerful predictor of coworker racial mix"[21]; and individuals who

attend diverse schools are more likely to live in integrated neighborhoods as

adults.[22]

Despite the numerous benefits that flow from diversity in our schools, many

of our students continue to learn in environments largely with same-race peers—

and with unequal resources across schools.  Although the K-12 public school

population has become increasingly diverse, during the 2020-21 school year, more

than a third of students, or approximately 18.5 million children, attended schools

where 75 percent or more of all students were of a single race or ethnicity.[23]

---

[20] Pat Rubio Goldsmith, *Learning Apart, Living Apart: How the Racial and Ethnic Segregation of Schools and Colleges Perpetuates Residential Segregation*, 112 Tchrs. C. Rec. 1602, 1603, 1618, 1620-1621 (Jun. 2010).

[21] Mickelson & Nkomo, *supra* note 3, at 217; *see also* Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition: Perpetuation Theory Reexamined*, 112 Tchrs. C. Rec. 1654, 1661, 1669-1670 (Jun. 2010) (finding that "those who attended more racially diverse high schools" ultimately chose jobs "in less racially isolated workplaces").

[22] Mickelson & Nkomo, *supra* note 3, at 218 (citing Michal Kurlaender & John T. Yun, *Fifty years after Brown: New Evidence of the Impact of School Racial Composition on Student Outcomes*, 6 Int'l J. Educ. Pol'y Rsch. & Practice 51-78 (2005), and Michal Kurlaender & John T. Yun, *Measuring School Racial Composition and Student Outcomes in a Multiracial Society*, 113 Am. J. Educ. 213-242 (2007)); Goldsmith, *supra* note 20, at 1621-1623.

[23] U.S. Gov't Accountability Off., GAO-22-104737, *K-12 Education: Student Population Has Significantly Diversified, But Many Schools Remain Divided*

(footnote continued)

Indeed, 14 percent of students attended schools where 90 percent or more of the students were of a single race or ethnicity.[24]  And students of color often attend schools with fewer resources, both financial and otherwise.[25]  For example, schools with high concentrations of poor and Black or Hispanic students tend to offer fewer math, science, and advanced placement classes.[26]

To benefit all students, many school systems in the United States have, like the Boston Public Schools, implemented race-neutral policies seeking to eliminate obstacles constraining students' access to educational resources and increase diversity of various kinds, including racial diversity.  For example, Cambridge,

--------

(footnote continued)
*Along Racial, Ethnic, and Economic Lines* 11 (June 2022), https://tinyurl.com/yc72adkh.

[24] *Id.*

[25] Lynette Guastaferro, *Why Racial Inequities are Rooted in Housing Policies*, USA Today (Nov. 2, 2020), https://tinyurl.com/2p96zwhk (discussing study showing that predominantly nonwhite school districts received $23 billion less in state and local funding than majority white school districts in 2016); Kenneth Shores *et al.*, *Categorical Inequalities Between Black and White Students are Common in US Schools—But They Don't Have to Be*, Brookings Institute (Feb. 21, 2020), https://tinyurl.com/5n94tp6f.

[26] Jennifer C. Kerr, *Report Finds Segregation in Education on the Rise*, AP News (May 17, 2016), https://tinyurl.com/yuypum3s (describing findings that schools with high concentrations of poor and Black or Hispanic students tended to have fewer math, biology, chemistry, and physics courses than more affluent counterparts with fewer minority students, and that less than half offered AP math courses); College Board, *AP Cohort Data Report: Graduating Class of 2021* (2022), https://tinyurl.com/yt6m94sd (Black students comprised 13.9% of all public high school seniors in 2020, but only 8.1% of students nationwide who took an AP exam).

Massachusetts, uses a "controlled choice" school-assignment policy based on a socioeconomic breakdown of the city that aims for each school's percentage of students who receive free or reduced school lunch to come close to the percentage of students who qualify in the district as a whole.[27]  To increase geographic, racial, and ethnic diversity at its specialized high schools, New York City has an alternative to standardized testing for admission, with eligibility for participation limited to students who are both individually disadvantaged and attending high-poverty middle schools.[28]  Meanwhile, Chicago's magnet and selective-enrollment schools admit students not only based on academic achievement, but also in part based on a socioeconomic analysis of the census tracts within the district.[29]

The Supreme Court has indeed encouraged school districts to undertake "serious, good faith consideration of" precisely these kinds of "workable race-neutral alternatives" to foster diversity, including racial diversity, in our schools,

---

[27] Cambridge Public Schools, *About Controlled Choice* (2022), https://tinyurl.com/ms3j9svf; Cambridge Public Schools, *Controlled Choice Plan* (Nov. 2013), https://tinyurl.com/3swp7h6p.

[28] *See* New York City Department of Education, Diversity in Admissions (2022), https://tinyurl.com/yckwrrad (describing program for specialized high schools); *Christa McAuliffe Intermediate School PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 264-65 (S.D.N.Y 2019) (denying preliminary injunction in equal protection challenge to 2018 expansion of this program), *aff'd*, 788 Fed. Appx. 85 (2d Cir. 2019) (unpublished).

[29] *See* Tracy Swartz, *Can Selective Enrollment in Chicago Public Schools be Fairer? Proposed Changes Aim to Make Admissions More Equitable: 'It's a Touchy Subject'*, Chicago Tribune (Mar. 11, 2022), https://tinyurl.com/3bpyn423.

*Parents Involved*, 551 U.S. at 735 (quoting *Grutter*, 539 U.S. at 339), most famously Texas's "Top Ten Percent Plan" described in the Supreme Court's *Fisher* decisions, 570 U.S. at 305; *Fisher v. University of Texas at Austin*, 579 U.S. 365, 371-72 (2016). Yet BPCAEC's requested holding here would deprive schools of these workable means to confer important educational benefits. Tellingly, while BPCAEC asserts that "[t]here are many things the School Committee might have tried to increase Black and Hispanic enrollment at the Exam Schools" aside from the ZIP-code-based formula, Br. 58, BPCAEC does not name a *single* such measure that would meet its proposed test—nor could it, because any measure intended to increase diversity, if successful, "by necessity" would reduce representation of other groups, and therefore be unconstitutional under its theory.

**B. The Plaintiff's Theory Also Threatens to Impede Effective Governmental Decision-Making in the Many Realms in Which Policymakers Necessarily Are Aware of and Consider Policies' Impact Across Racial Groups.**

Beyond the realm of student body diversity, BPCAEC's theory would call into question the constitutionality of other race-neutral measures governments frequently employ when distributing limited benefits and inevitable burdens among their residents. As the Supreme Court has long recognized, "a whole range of tax, welfare, public service, regulatory, and licensing statutes" may foreseeably "be more burdensome" for particular racial groups—but the Equal Protection Clause permits the government to maintain those policies despite awareness of such

impacts. *Washington v. Davis*, 426 U.S. 229, 248 (1976) (noting that subjecting all such programs to strict scrutiny "would be far reaching and would raise serious questions about, and perhaps invalidate," many). If adopted, BPCAEC's view—that aiming to increase diversity or equity in such government programs, including for under-represented racial groups, necessarily entails animus against other racial groups and therefore requires strict scrutiny—would gravely impair governments' ability to make sound policy. And the rule would have dramatic and nonsensical policy consequences, effectively locking in place whatever happens to be the current demographic distribution.

Basic race-neutral public health measures, for example, could become susceptible to strict scrutiny under BPCAEC's proposed theory. Governments at all levels have grappled with the COVID-19 pandemic's disproportionate impacts on communities that are medically underserved.[30] Federal, state, and local data show significant disparities in COVID-19 cases and deaths between people of

---

[30] *See, e.g.*, Helene Gayle *et al.*, *Framework for Equitable Allocation of COVID-19 Vaccines*, National Academies of Sciences, Engineering, and Medicine (2020); National Institutes of Health, *NIH to Assess and Expand COVID-19 Testing for Underserved Communities* (Sep. 30, 2020), https://tinyurl.com/fnm6zk59; Massachusetts Department of Public Health, *Baker-Polito Administration Launches Targeted Outreach Initiative in 20 Hardest Hit Communities to Increase Equity in COVID-19 Vaccine Awareness and Access; $1M to Support Vaccination in Historically Underserved Communities* (Feb. 16, 2021), https://tinyurl.com/4fbrm5kr.

color and their white counterparts.[31]  Several factors contribute to these disparities, including long-existing inequities that have resulted in, among other things, lack of access to safe and affordable housing, lack of access to quality healthcare and health insurance, and lower incomes.[32]

Recognizing this demographic reality, legislators and public health policymakers have taken steps to help allocate scarce resources to these and other communities in need.[33]  Many States, for instance, implemented vaccine allocation strategies based on the Center for Disease Control and Prevention's Social Vulnerability Index (SVI), which uses U.S. Census Bureau data to measure the

---

[31] *See, e.g.*, Benjamin Mueller, *In Rural America, Covid Hits Black and Hispanic People Hardest*, N.Y. Times (July 28, 2022); CDC, *COVID-19 Weekly Cases and Deaths per 100,000 Population by Age, Race/Ethnicity, and Sex* (last updated May 12, 2022), https://tinyurl.com/3e6ct57f; Latoya Hill & Samantha Artiga, *COVID-19 Cases and Deaths by Race/Ethnicity: Current Data and Changes Over Time*, Kaiser Family Foundation (Feb. 22, 2022), https://tinyurl.com/4jht942c; Sarah A. Lister *et al.*, *Health Equity and Disparities During the COVID-19 Pandemic: Brief Overview of the Federal Role*, Cong. Rsch. Serv., R46861 (2021); Nambi Ndugga *et al.*, *Early State Vaccination Data Raise Warning Flags for Racial Equity*, Kaiser Family Foundation (Jan. 21, 2021), https://tinyurl.com/99kty57n.

[32] *See* Adelle Simmons *et al.*, *Health Disparities by Race and Ethnicity During the COVID-19 Pandemic: Current Evidence and Policy Approaches*, U.S. Dep't of Health and Hum. Serv., Off. of the Assistant Sec'y for Plan. & Evaluation, Issue Brief (Mar. 16, 2021), https://tinyurl.com/46ta6ex2.

[33] *See, e.g.*, Exec. Order No. 13995, 86 C.F.R § 7193 (Jan. 21, 2021) (establishing a COVID-19 Health Equity Task Force to make recommendations on "mitigating the health inequities caused or exacerbated by the COVID-19 pandemic and for preventing such inequities in the future"); Massachusetts Executive Office of Health & Human Services, *COVID-19 Equity Plan* (Mar. 14, 2022), https://tinyurl.com/y39svew6.

"relative social vulnerability of every census tract."[34]  The SVI tracks variables

such as socioeconomic status, household composition, whether a household

member has a disability, language spoken, housing type, availability of

transportation, and racial or ethnic minority status.[35]  Based upon this information

and COVID-19 case rates, Massachusetts allocated additional vaccines and

resources to the 20 communities most disproportionately impacted by the

pandemic.[36]  Similarly, New York has adopted numerous race-neutral methods to

address vaccine hesitancy and low vaccination rates among its hardest-to-reach

communities, which were disproportionately communities of color.[37]

---

[34] Nambi Ndugga *et al.*, *How are States Addressing Racial Equity in COVID-19 Vaccine Efforts?,* Kaiser Family Foundation (Mar. 10, 2021), https://tinyurl.com/mtpue9hy.

[35] CDC, *Minority Health Social Vulnerability Index Overview* (Nov. 19, 2021), https://tinyurl.com/4d79742f.

[36] Massachusetts Executive Office of Health & Human Services, *supra* note 33.

[37] *See, e.g.*, CBS-New York, *COVID Vaccine: 2 New Sites for Underserved Communities Opening In New York City* (Feb. 10, 2021), https://tinyurl.com/y5zhywnz (describing federal partnership); Spectrum News 1, *Bringing the Vaccine—and Reassurance—to Underserved Populations* (July 1, 2021), https://tinyurl.com/59ayh56t (announcing vaccine distribution center at public housing site); Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Allocation of $15 Million to Promote Vaccination in Communities Disproportionately Affected by COVID-19 Pandemic (July 26, 2021), https://tinyurl.com/2p83j74y; NBC New York, *Vaccine Appointments Open for Underserved Zip Codes in Queens, Brooklyn at NY-FEMA Sites* (Feb. 20, 2021), https://tinyurl.com/3sbmhzmj (describing initiative setting aside first-week appointments at new vaccination sites for specified zip codes to reach underserved, hardest-hit communities); Press Release, New York Governor Andrew Cuomo,

(footnote continued)

If BPCAEC's desired reasoning were to prevail, however, health policy that has as one of its goals increasing resources for underserved groups in order to promote health equity—even if it does not explicitly factor race into any individual grant of a resource—may be subject to strict scrutiny, because, where resources are finite, an increase in resources for some racial groups "by necessity" limits the availability of those resources for others. BPCAEC Br. 52; *see also* BPCAEC Br. 46 (decrying BPS planning tool replacing "equality" with "equity," meaning "those with highest needs are prioritized"). The implication of BPCAEC's misreading of precedent is that policymakers cannot intentionally use limited resources to attempt to address such health disparities, even through race-neutral measures. *See Spurlock*, 716 F.3d at 394 ("If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions.").

BPCAEC's theory thus threatens to ossify the distribution of benefits and burdens across our society in untold irrational and pernicious ways. If a particular government policy were shown to result in significant barriers to access for some

---

(footnote continued)
Governor Cuomo Announces Partnership with SOMOS Community Care to Vaccinate Underserved New Yorkers for COVID-19 at Community Medical Practices (Mar. 26, 2021), https://tinyurl.com/2p9b3c5h.

demographically identifiable racial groups, policymakers could not address those barriers, even through race-neutral means, without facing strict scrutiny: Whenever such efforts to ensure that the benefits of public policymaking reach all of our communities could potentially affect how resources are currently allocated to other racial groups, this theory would condemn the measures as presumptively unconstitutional. While the Equal Protection Clause requires the States to meet strict scrutiny where we find it necessary to use individual racial classifications to achieve policy aims, it imposes no such constraint on race-neutral policies aiming to achieve equity, address barriers to access, foster diversity, or simply function in a world shaped by demographic realities.

## **CONCLUSION**

For the foregoing reasons, if the Court reaches the merits of this dispute rather than dismissing this appeal as moot, the District Court's judgment below should be affirmed.

Respectfully submitted,

MAURA HEALEY
  *Attorney General of Massachusetts*
Elizabeth N. Dewar, 1st Cir. No. 1149723
  *State Solicitor*
Ann E. Lynch
David Ureña
  *Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2204
bessie.dewar@mass.gov

Date: September 9, 2022

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KARL A. RACINE
*Attorney General for the District
of Columbia*
400 6th Street NW
Washington, D.C. 20001

HOLLY T. SHIKADA
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of
Nevada*
100 North Carson St.
Carson City, NV 89701

28

Hector Balderas
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

Letitia James
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

Ellen F. Rosenblum
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

Josh Shapiro
*Attorney General of Pennsylvania*
16th Fl., Strawberry Sq.
Harrisburg, PA 17120

Peter F. Neronha
*Attorney General of
Rhode Island*
150 South Main St.
Providence, RI 02903

Robert W. Ferguson
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

# CERTIFICATES OF COMPLIANCE AND SERVICE

## Certificate of Compliance with Rule 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ Elizabeth N. Dewar

## Certificate of Service

I hereby certify that on September 9, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel of record for all parties are registered as ECF Filers and will therefore be served by the CM/ECF system.

/s/ Elizabeth N. Dewar