# United States Court of Appeals
## For the First Circuit

———————

```
Nos. 21-1303
     22-1144
```

BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,

Plaintiff, Appellant,

v.

THE SCHOOL COMMITTEE FOR THE CITY OF BOSTON; ALEXANDRA OLIVER-
DÁVILA; MICHAEL O'NEILL; HARDIN COLEMAN; LORNA RIVERA; JERI
ROBINSON; QUOC TRAN; ERNANI DEARAUJO; BRENDA CASSELLIUS,

Defendants, Appellees,

THE BOSTON BRANCH OF THE NAACP; THE GREATER BOSTON LATINO
NETWORK; ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK;
ASIAN AMERICAN RESOURCE WORKSHOP; MAIRENY PIMENTAL; H.D.,

Defendants, Intervenors, Appellees.

———————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

———————

Before

Kayatta, Howard, and Thompson,
Circuit Judges.

———————

Christopher M. Kieser, Joshua P. Thompson, and Pacific Legal
Foundation, with whom William H. Hurd, and Eckert Seamans Cherin
& Mellott, LLC, were on brief for appellant.
   Kay H. Hodge, John M. Simon, and Stoneman, Chandler & Miller

LLP, with whom Lisa Maki, Legal Advisor, Boston Public Schools, were on brief for appellees.

Doreen M Rachal, and Sidley Austin LLP, with whom Susan M. Finegan, Andrew N. Nathanson, Mathilda S. McGee-Tubb, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., were on brief for intervenors-appellees.

Rachael S. Rollins, United States Attorney, Lisa Brown, General Counsel, U.S. Department of Education, Daniel Kim, and Jessica Wolland, Attorneys, Office of the General Counsel, U.S. Department of Education, Kristen Clarke, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, Nicolas Y. Riley, and Sydney A.R. Foster, Attorneys, Civil Rights Division, were on brief for the United States of America, amicus curiae.

Amanda Buck Varella, Melanie Dahl Burke, and Brown Rudnick LLP, with whom Francisca D. Fajana, Niyati Shah, and Eri Andriola, were on brief for Asian Americans Advancing Justice-AAJC, Autism Sprinter, Boston University Center for Antiracist Research, Citizens for Public Schools, Edvestors, GLBTQ Legal Advocates & Defenders, Hamkae Center, Hispanic Federation, Inc., Jamaica Plain Progressives, LatinoJustice PRLDEF, Massachusetts Advocates for Children, Massachusetts Appleseed Center for Law and Justice, Massachusetts Law Reform Institute, Mass Insight Education and Research Institute, Montgomery County Progressive Asian American Network, and Progressive West Roxbury/Roslindale, amici curiae.

Maura Healey, Attorney General of Massachusetts, Elizabeth N. Dewar, State Solicitor, Ann E. Lynch, and David Ureña, Assistant Attorneys General of Massachusetts, were on brief for Massachusetts, California, Colorado, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, and Washington, amici curiae.

Michael Sheetz, Adam S. Gershenson, Michael McMahon, Robby K.R. Saldaña, and Cooley LLP, were on brief for the Anti-Defamation League, Black Economic Council of Massachusetts, Inc., Boston Bar Association, The Greater Boston Chamber of Commerce, Jewish Alliance for Law and Social Action, King Boston, and Massachusetts Immigrant and Refugee Advocacy Coalition, amici curiae.

Sarah Hinger, Woo Ri Choi, Matthew Segal, Ruth A. Bourquin, Jon Greenbaum, David Hinojosa, and Genevieve Bonadies Torres, were on brief for the American Civil Liberties Union Foundation, American Civil Liberties Union of Massachusetts, Inc., Lawyers' Committee for Civil Rights Under Law, and National Coalition on School Diversity, amici curiae.

Paul Lantieri III, and Ballard Spahr LLP, were on brief for the National Association for Gifted Children, amicus curiae.

December 19, 2023

KAYATTA, **Circuit Judge**.  We consider for a second time this appeal challenging on equal protection grounds a temporary admissions plan (the "Plan") for three selective Boston public schools.  Previously, we denied a motion by plaintiff Boston Parent Coalition to enjoin use of the Plan until this appeal could be decided on the merits.  In so doing, we held that the Coalition failed to show that it would likely prevail in establishing that defendants' adoption of the Plan violated the equal protection rights of the Coalition's members.

We turn our attention now to the merits of the appeal after full briefing and oral argument.  For the following reasons, we find our previously expressed skepticism of the Coalition's claim to be well-founded.  We therefore affirm the judgment below. We also explain why events since we last opined in this case do not mandate a different resolution.

## I.

A full discussion of the facts and litigation giving rise to this appeal can be found in the prior opinions of this court and the district court.  See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos. (Boston Parent I), 996 F.3d 37, 41-43 (1st Cir. 2021); Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos. (Indicative Ruling), No. CV 21-10330, 2021 WL 4489840, at *3-4 (D. Mass. Oct. 1, 2021); Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City

of Bos., No. 21-10330, 2021 WL 1422827 (D. Mass. Apr. 15, 2021)
withdrawn by Bos. Parent Coal. for Acad. Excellence Corp. v. Sch.
Comm. of City of Bos., No. 21-10330, 2021 WL 3012618 (D. Mass.
July 9, 2021). We provide now only an abbreviated review of the
record, focusing on those points pertinent to the appeal before
us.

Boston Latin Academy, Boston Latin School, and the
John D. O'Bryant School (collectively known as the "Exam Schools")
are three of Boston's selective public schools. For the twenty
years preceding the 2021-2022 school year, admission to the Exam
Schools was based on applicants' GPAs and their performance on a
standardized test. The schools combined each applicant's GPA and
standardized test score to establish a composite score ranking
applicants citywide. Exam School seats were then filled in order,
beginning with the student with the highest composite score, based
on the students' ranked preferences among the three schools. The
racial/ethnic demographics for the students offered admission to
the Exam Schools for the 2020-2021 school year were: White (39%);
Asian (21%); Latinx (21%); Black (14%); and mixed race (5%). By
contrast, the racial/ethnic demographics for the citywide school-

age population in Boston that same year were: White (16%);
Asian (7%); Latinx (36%); Black (35%); and mixed race (5%).[1]

During the summer of 2019, Boston Public Schools
conducted several analyses of how potential changes to admissions
criteria would affect racial/ethnic demographics at the Exam
Schools.  Following this process, Boston Public Schools developed
a new exam to be administered to Exam School applicants beginning
with the 2021-2022 school year.  However, when COVID-19 struck,
the Boston School Committee determined that the Exam School
admissions criteria for 2021-2022 needed revision in light of the
pandemic's impact on applicants during both the 2019-2020 and the
prospective 2020-2021 school years.

In March 2020, citing the COVID-19 pandemic,
Massachusetts Governor Charlie Baker suspended all regular, in-
person instruction and other educational operations at K-12 public
schools through the end of the 2019-2020 school year.  Schools
transitioned to full remote learning.  Pandemic-related gathering
restrictions made administering the in-person test difficult.

The Boston School Committee convened a Working Group to
recommend revised admissions procedures for the 2021-2022 school
year.  This group met regularly from August to October 2020,

---

[1]  We use the listed racial classifications only to be consistent
with the district court's usage, to which neither party lodges any
objection.

reviewing extensive data regarding the existing Exam School admissions process, alternative selection methods used in other cities, and potential impacts of different proposed methodologies on students.  As part of its process, the Working Group completed a so-called "equity impact statement" that stated the desired outcomes of the revised admissions criteria recommendation as follows:

> Ensure that students will be enrolled (in the three exam high schools) through a clear and fair process for admission in the 21–22 school year that takes into account the circumstances of the COVID-19 global pandemic that disproportionately affected families in the city of Boston.
>
> Work towards an admissions process that will support student enrollment at each of the exam schools such that it better reflects the racial, socioeconomic and geographic diversity of all students (K-12) in the city of Boston.

As part of its process, the Working Group reviewed multiple simulations of the racial compositions that would result from different potential admissions criteria.

The Working Group presented its initial recommendations to the Boston School Committee on October 8, 2020.  During this meeting, members of the Working Group discussed historical racial inequities in the Exam Schools, and previous efforts to increase equity across the Exam Schools.  The Working Group also discussed a substantial disparity in the increase in fifth grade GPAs for

White and Asian students as compared to Black and Latinx students, the disproportionate negative impact of the COVID-19 pandemic on minority and low-income students, a desired outcome of "rectifying historic racial inequities afflicting exam school admissions for generations," and, as one School Committee member stated, the "need to figure out again how we could increase these admissions rates, especially for Latinx and Black students."  Another School Committee member stated that she "want[ed] to see [the Exam Schools] reflect the District[,]" and that "[t]here's no excuse . . . for why they shouldn't reflect the District, which has a larger Latino population and Black African-American population."

The School Committee met on October 21, 2020, to discuss the Working Group's plan.  At that meeting, race again became a topic of discussion.  Some School Committee members voiced concerns that the revised plan, while an improvement, "actually [did not] go far enough" because it would likely still result in a greater percentage of White and Asian students in exam schools than in the general school-age population.  During this meeting, School Committee chairperson Michael Loconto made comments mocking the names of some Asian parents.  Two members of the School Committee, Alexandra Oliver-Dávila and Lorna Rivera, texted each other regarding the comments, with one saying "I think he was making fun of the Chinese names!  Hot mic!!!" and another responding that she

"almost laughed out loud."  The chairperson apologized and resigned the following day.

Subsequently, the Working Group recommended and the School Committee adopted the Plan.  With test administration not feasible during the COVID-19 pandemic, the Plan relied on GPAs to select Exam School admittees for the 2021–2022 school year.  It first awarded Exam School slots to those students who, citywide, had the top 20% of the rank-ordered GPAs.  The remaining applicants were then divided into groups based on the zip codes in which they resided (or, in the case of students without homes or in state custody, to a designated zip code).

Next, starting with the highest ranked applicants living in the zip code with the lowest median family income (for families with school age children), and continuing with applicants in each zip code in ascending order of the zip code's median family income, 10% of the remaining seats at each of the three Exam Schools were filled based on GPA and student preferences.  Ten rounds of this process filled more or less all remaining available seats in the three schools.

The Coalition, a corporation acting on behalf of some parents and their children who reside in Boston, sued the School Committee, its members, and the Boston Public Schools superintendent.  The Coalition asserted that the Plan violated the Equal Protection Clause of the Fourteenth Amendment of the United

States Constitution and chapter 76, section 5 of the Massachusetts General Laws by intentionally discriminating against White and Asian students.  Boston Parent I, 996 F.3d at 43.  After the Coalition moved for a preliminary injunction to bar the School Committee from implementing the Plan, the district court consolidated a hearing on the motion with a trial on the merits following the parties' submission of a Joint Agreed Statement of Facts.  The district court found the Plan to be constitutional. The Coalition subsequently appealed that decision on the merits and sought interim injunctive relief from this Court pending resolution of the merits appeal.  We denied the interim request for injunctive relief, in large part because we determined the Coalition was unlikely to succeed on the merits.  Id. at 48.

Following our decision, on June 7, 2021, the Boston Globe published previously undisclosed evidence of an additional text-message exchange between School Committee members Oliver-Dávila and Rivera during the Board Meeting at which the Committee adopted the Plan.  Reacting to the Committee chairman's mocking of Asian parent names, Oliver-Dávila texted Rivera "[b]est s[chool] c[ommittee] m[ee]t[in]g ever I am trying not to cry."  Rivera responded, "Me too!!  Wait til the White racists start yelling [a]t us!"  Oliver-Dávila then responded "[w]hatever . . . they are delusional."  Additionally, Oliver-Dávila texted "I hate WR," which the parties seem to agree is short for West Roxbury, a

predominantly White neighborhood.  Rivera then responded "[s]ick of westie whites," to which Oliver-Dávila replied "[m]e too I really feel [l]ike saying that!!!!"

Armed with these revelations, the Coalition moved for relief under Federal Rule of Civil Procedure 60(b), asking the district court to reconsider its judgment or at least allow more discovery.  Following an indicative ruling by the district court pursuant to Federal Rule of Civil Procedure 12.1, we remanded the case to the district court so that it could rule formally on the Coalition's Rule 60(b) motion.  The district court deemed the text messages "racist," and found that they showed that "[t]hree of the seven School Committee members harbored some form of racial animus." Bos. Parent Coal., 2021 WL 4489840, at *15.  The district court nonetheless denied the Coalition's motion, finding that relief under Rule 60(b) was not warranted on at least two grounds. Id. at *13–16.  First, the district court found that the Coalition could have discovered the new evidence earlier with due diligence, and that it was only the result of the Coalition's deliberate litigation strategy -- namely, its theory that it need not show animus to prove intentional discrimination -- that no such evidence was discovered.  Id. at *15.  Second, the district court found that the new evidence would not change the result were a new trial to be granted.  Id. at *15–16.

As to the second finding, the district court noted that "it is clear from the new record that the race-neutral criteria were chosen precisely because of their effect on racial demographics," that is, "but for the increase in Black and Latinx students at the Exam Schools, the Plan's race-neutral criteria would not have been chosen." Id. at *15. However, the court concluded that the new evidence in question did not cure the Coalition's persistent failure to show any legally cognizable disparate impact on White or Asian students under the facially neutral Plan. Id. The district court thus denied the Coalition's Rule 60(b) motion. Id. at *17.

Meanwhile, following our earlier denial of the Coalition's request for injunctive relief, Boston Public Schools implemented the Plan for admissions to the Exam Schools for the 2021–2022 school year. Shortly thereafter, the challenged Plan was replaced with a plan based on GPA, a new standardized examination, and census tracts. The Coalition does not challenge the current admissions plan in this appeal.

With its request to enjoin use of the Plan now moot, the Coalition still persists with this appeal, pointing to five children of its members who were denied admission to the Exam Schools in 2021 despite allegedly having higher GPAs than those of some students in other zip codes who were admitted. The Coalition asks that we remand the case to the district court with

- 12 -

instructions to order the School Committee to admit these five
students to an Exam School.[2]   Additionally, the Coalition appeals
the district court's denial of its Rule 60(b) motion.

## II.

Before we turn to the merits, we address a threshold
question of justiciability.  The Coalition argues that if the Plan
had not been adopted, the City would have based invites to the
Exam Schools on GPA in a citywide competition, just as it did for
20% of the slots.  And in that event, all five students for whom
the Coalition seeks relief would have been admitted.  The School
Committee argues that the Coalition has no Article III standing to
seek relief on behalf of five students who are not parties to this
lawsuit, and that even if it did, there is no basis for granting
the requested relief.

An association has standing to bring suit on behalf of
its individual members when: "(a) its members would otherwise have
standing to sue in their own right; (b) the interests it seeks to
protect are germane to the organization's purpose; and (c) neither
the claim asserted nor the relief requested requires the

---

[2]  Defendants contend that it is too late for the Coalition to
revise its request for relief.  But the Coalition promptly revised
its request as events unfolded in the district court.  And in these
circumstances, granting such a revised request is not beyond the
court's "broad and flexible" power to fashion an equitable remedy.
See Morgan v. Kerrigan, 530 F.2d 431, 432 (1st Cir. 1976).

- 13 -

participation of individual members in the lawsuit." Coll. of
Dental Surgeons of P.R. v. Conn. Gen. Life Ins. Co., 585 F.3d 33,
40 (1st Cir. 2009) (quoting Hunt v. Wash. State Apple Advertising
Comm'n, 432 U.S. 333, 343 (1977)).  Here, only the third of these
so-called Hunt factors is in dispute.  The School Committee
contends that, because the Coalition now seeks injunctive relief
for five individual members who are not themselves plaintiffs in
this action, their individual participation in the lawsuit is
required.  Therefore, they argue, the Coalition lacks independent
associational standing under Hunt.

     "There is no well-developed test in this circuit as to
how the third prong of the Hunt test -- whether 'the claim asserted
[or] the relief requested requires the participation of individual
members in the lawsuit,' -- applies in cases where injunctive
relief is sought." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294,
313-14 (1st Cir. 2005) (Boudin, J. & Dyk, J., concurring) (quoting
Hunt, 432 U.S. at 343).  Here, granting the Coalition's requested
remedy would certainly require some factual showing that some or
all of the five students would have been admitted to an Exam School
but for the adoption of the Plan.  However, given the documented
and apparently uncontested nature of the student-specific facts
likely to be included in such a showing (i.e., GPA and school
preference), it seems unlikely that any of the students would need
to do much, if anything, in the lawsuit.  Moreover, the Coalition's

requested remedy, if granted, would clearly "inure to the benefit of those members of the association actually injured." Id. at 307 (quoting Warth v. Seldin, 422 U.S. 490, 515 (1975)).

The School Committee responds that if it did not use zip codes, it would not have chosen to use GPAs citywide as its sole selection criterion instead. It notes that such a GPA-only admissions plan has not been used for over twenty years, and therefore that the basis for the Coalition members' asserted injuries is purely speculative. Moreover, the School Committee questions the evidentiary basis of the assertions on behalf of the unnamed children.

These arguments strike us as better suited to challenging the merits of the Coalition's claims, not its standing to assert those claims. In substance, the School Committee disputes what would have happened had it not used the Plan. And on that point, the record is not clear enough to dismiss the Coalition's position as speculative. Moreover, at this stage, we need only note that courts have broad authority to fashion equitable relief following a finding of an equal protection violation. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). Therefore, we see no bar -- at least at

the threshold of justiciability -- to the Coalition's claim for equitable relief on behalf of some of its individual members. We now turn to the merits.

### III.

### A.

When reviewing the merits of a district court's decision on a stipulated record, we review legal conclusions de novo and factual findings for clear error. See Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 5 (1st Cir. 2022). Yet, "when the issues on appeal 'raise[ ] either questions of law or questions about how the law applies to discerned facts,' such as whether the proffered evidence establishes a discriminatory purpose or a disproportionate racial impact, 'our review is essentially plenary.'" Boston Parent I, 996 F.3d at 45 (quoting Anderson ex rel. Dowd v. City of Bos., 375 F.3d 71, 80 (1st Cir. 2004)). "Similarly, we review de novo the district court's other legal conclusions, including the level of scrutiny it applied when evaluating the constitutionality of the challenged action." Id.

### B.

The Fourteenth Amendment prohibits "all governmentally imposed discrimination based on race," save for those rare and compelling circumstances that can survive the daunting review of strict scrutiny. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 206 (2023) (quoting

- 16 -

Palmore v. Sidoti, 466 U.S. 429, 432 (1984)).  The Equal Protection Clause's "central purpose" is to "prevent the States from purposefully discriminating between individuals on the basis of race."  See Shaw v. Reno, 509 U.S. 630, 642 (1993).  Generally, purposeful racial discrimination violative of the Equal Protection Clause falls into three categories of state action that merit strict scrutiny: (1) where state action expressly classifies individuals by race (see, e.g., Students for Fair Admissions, 600 U.S. at 194-95; Grutter v. Bollinger, 539 U.S. 306, 327-28 (2003)); (2) where a policy is facially neutral but is in fact unevenly implemented based on race (see Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886)); and (3) where a facially race-neutral, and evenly applied, policy results in a racially disparate impact and was motivated by discriminatory intent (see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); Washington v. Davis, 426 U.S. 229, 242 (1976)).

The Coalition's principal arguments for challenging the Plan fall into category (3) -- an evenly applied, facially race-neutral plan that was motivated by a discriminatory purpose and has a disparate impact.  But the record provides no evidence of a relevant disparate impact.  And the evidence of defendants' intent to reduce racial disparities is not by itself enough to sustain the Coalition's claim.  Our reasoning follows.

**1.**

The Coalition makes two attempts to show that the School Committee's use of the Plan to determine Exam School admissions had a disparate impact on the Coalition's members. We address each in turn.

**a.**

To prove that the Plan had a disparate impact on its members, the Coalition first points out that White and Asian students made up a smaller percentage of the students invited to join the Exam Schools under the Plan than in the years before the Plan was implemented. Specifically, with respect to the prior year, the percentages of invited students classified as White dropped from 40% to 31%, while the percentage classified as Asian dropped from 21% to 18%.

The Coalition's reliance on these raw percentages without the benefit of some more robust expert analysis serves poorly as proof that the observed changes were caused by the Plan rather than by chance. See Boston Parent I, 996 F.3d at 46 (noting that the Coalition "offers no analysis or argument for why these particular comparators, rather than a plan based on random selection, are apt for purposes of determining adverse disparate impact"); see also Coal. for TJ v. Fairfax Cnty. Sch. Bd., 68 F.4th 864, 881 (4th Cir. 2023).

Nevertheless, given the size of the overall pool, the reductions cited by the Coalition may be at least minimally significant. Notably, when the defendants applied the Plan to the prior year's admission applications in a test-run simulation, it produced virtually the same percentage changes. And defendants have never claimed that the changes were entirely random. To the contrary, the Plan's effects were expected, at least in part, by those who knew the schools best: the defendants themselves. We therefore do not rest our decision on the lack of expert evidence that changes in the racial makeup of the admitted class in 2021–2022, as compared to 2020–2021, were not the result of mere chance.

Rather, we find that the Coalition fails to show disparate impact for another, more fundamental reason. To see why this is so, we find it instructive to consider disparate impact theory in its most customary form -- a statutory cause of action for unintentional discrimination in certain settings, such as employment. See, e.g., Jones v. City of Bos., 752 F.3d 38, 53 (1st Cir. 2014) (applying Title VII, 42 U.S.C. § 2000e-2(k)). A theory of unintentional discrimination cannot, by itself, establish liability in an equal protection case such as this, which requires proof of both disparate impact and discriminatory intent. See Arlington Heights, 429 U.S. at 266-68. Our point, instead, is that even when sufficient to establish liability in its native habitat of Title VII, disparate impact theory does not call into

- 19 -

question the introduction of facially neutral, and otherwise valid, selection criteria that reduce racial disparities in the selection process. In fact, where applicable, disparate-impact discrimination jurisprudence does just the opposite. As between alternative, equally valid selection criteria, it encourages the use of the criterion expected to create the least racial disparity unless there is some good reason to do otherwise. Cf. 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (C).

In this manner, disparate-impact analysis aims to counter the use of facially neutral policies that "'freeze' the status quo of prior discriminatory . . . practices." Griggs v. Duke Power Co., 401 U.S 424, 430 (1971). That is to say, it encourages precisely what the Coalition claims the Plan has done here: as between equally valid selection processes that meet the selector's legitimate needs, to use the one that reduces under-representation (and therefore over-representation as well). So, in seeking to leverage a disparate-impact theory of discrimination against the Plan for its alleged reduction -- but not reversal -- of certain races' stark over-representation among Exam School invitees, the Coalition has it backwards.

To be sure, where race itself is used as a selection criterion, certainly a before-and-after comparison would provide relevant support for an equal protection challenge. In that context, any "negative" effect resulting from the use of race would

be relevant because "race may never be used as a 'negative.'" Students for Fair Admissions, 600 U.S. at 218. Here, though, the Plan did not use the race of any individual student to determine his or her admission to an Exam School. And the Coalition offers no evidence that geography, family income, and GPA were in any way unreasonable or invalid as selection criteria for public-school admissions programs.

In sum, even assuming the Coalition's statistics show non-random demographic changes in the pool of Exam School invitees between 2020-2021 and 2021-2022 as a result of the Plan's implementation, those changes simply show that as between equally valid, facially neutral selection criteria, the School Committee chose an alternative that created less disparate impact, not more.[3] To rule otherwise would turn "the previous status quo into an immutable quota" and risk subjecting any new policy that "might impact a public institution's racial demographics -- even if by wholly neutral means -- to a constitutional attack." Coal. for TJ, 68 F.4th at 881 (internal quotation omitted).

**b.**

This brings us to the Coalition's alternative attempt to employ disparate-impact theory to prove prohibited intentional

---

[3] Moreover, by not using zip codes to award 20% of the invitations, the School Committee opted not to use an approach that would have reduced racial disparities even more.

- 21 -

race discrimination.  The Coalition contends that the Plan, even when measured against a process of random selection, had a disparate impact on White and Asian applicants.  To make this argument, the Coalition first notes that the overall acceptance rate for applicants for the 2021-2022 school year was 58.5%.  And it posits that a random distribution would result in an even application of that 58.5% rate across each zip code.  The Coalition then isolates certain zip codes where the population was either "predominantly" (as in 55% or greater) White/Asian or Black/Latinx, and juxtaposes those zip codes' respective acceptance rates under the Plan with those under a hypothetical 58.5% comparator.  Following this logic, the Coalition concludes that the Plan resulted in 66 fewer than expected spots allocated across ten predominantly White/Asian zip codes, and 57 more spots across seven predominantly Black/Latinx zip codes.  Using this same data, the Coalition also argues that because the average GPA of the admitted students from the predominantly White/Asian zip codes was higher than that from the predominantly Black/Latinx zip codes, the Plan made it disproportionally more difficult for White and Asian students to gain acceptance.

In our view, this backfilled analysis -- crafted by counsel in an appellate brief -- falls woefully short of the mark. The analysis uses GPA data from only ten of the twenty zip codes that the Coalition identifies as "predominantly" White and Asian.

It also neglects another two zip codes where, ostensibly, there was neither a predominantly White/Asian nor Black/Latinx population under the Coalition's definition. And all the while, the Coalition never explains why 55% should be the relevant threshold, nor why aggregating populations of separate racial groups is methodologically coherent.[4]

Moreover, the Coalition's analysis rests on a sleight of hand. It counterfactually assumes that if White/Asian students comprised 55% or more of the students in a given zip code, then every marginal student in that zip code who just missed out on acceptance was also White or Asian. Suffice it to say, there is zero evidence for this assumption. The bottom line remains the same: White and Asian students respectively made up approximately 16% and 7% of the eligible school-age population and 31% and 40% of the successful applicants. Use of the Plan caused no relevant disparate impact on those groups.[5] Cf. Coal. for TJ, 68 F.4th at

_____

[4] Intervenors-appellees raise additional alarms about the Coalition's data, noting that several zip codes cited by the Coalition as "predominantly" White and Asian actually have a greater Black or Latinx population than Asian.

[5] The district court found that "the Coalition's evidence of disparate impact was a projection of a prior plan that showed White students going from representing 243 percent of their share of the school-age population in Boston to 200 percent, and Asian students going from representing 300 percent of their share of the school-age population in Boston to 228 percent." Bos. Parent Coal., 2021 WL 4489840, at *15. As to the actual admissions data, the district court made no such findings, but we take notice that for seventh-grade applicants, the Plan resulted in White students, who

879 (finding no disparate impact on Asian-American students under school admissions policy where "those students have had greater success in securing admission to [the school] under the policy than students from any other racial or ethnic group").

**2.**

We turn next to the Coalition's argument that it need not prove a disparate impact per se.  Rather, the Coalition contends that any change in the racial composition of admitted students is unconstitutional if the change was intended -- even if it is the result of facially neutral and valid selection criteria that merely reduce, but do not reverse, the numerical over-representation of a particular race.  There are several problems with this theory.

First, the Coalition points to no case in which a facially neutral selection process was found to violate the Equal Protection Clause based on evidence of intent without any corollary disparate impact.  To the contrary, to successfully challenge the use of a facially neutral, and otherwise bona fide, selection criterion, the Coalition must prove both improper intent and disparate impact.  Anderson ex rel. Dowd, 375 F.3d at 89 (noting that "[c]ourts can only infer that an invidious racial purpose

---

constitute 16% of the Boston school-age population, receiving 31% of the invitations, and Asian students, who constitute 7% of that population, receiving 18% of the invitations.

motivated a facially neutral policy when that policy creates
disproportionate racial results"); see also Lewis v. Ascension
Parish Sch. Bd., 806 F.3d 344, 359 (5th Cir. 2015) ("To subject a
facially race neutral government action to strict scrutiny, the
plaintiff must establish both discriminatory intent and a
disproportionate adverse effect upon the targeted group."); Coal.
for TJ, 68 F.4th at 882 (quoting Palmer v. Thompson, 403 U.S. 217,
224 (1971)) (agreeing and noting that "[n]o case in [the Supreme]
Court has held that a legislative act may violate equal protection
solely because of the motivations of the men who voted for
it . . . ."); Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d
524, 549 (3d Cir. 2011) ("Although disproportionate impact, alone,
is not dispositive, a plaintiff must show discriminatory impact in
order to prove an equal protection violation.").

　　　　Second, the Coalition's "intent only" theory runs
counter to what appears to be the view of a majority of the members
of the Supreme Court as expressed in Students for Fair Admissions.
There, the Court found that Harvard and UNC's race-conscious
admissions programs violated the Equal Protection Clause.  600
U.S. at 213.  But in rejecting the universities' use of an
applicant's race as a means to achieve a racially diverse student
body, three of the six justices in the majority -- with no
disagreement voiced by the three dissenters -- separately stressed
that universities can lawfully employ valid facially neutral

selection criteria that tend towards the same result.  See id. at
299-300 (Gorsuch, J., with Thomas, J., concurring) (recounting the
argument that the universities "could obtain significant racial
diversity without resorting to race-based admissions practices,"
and noting that "Harvard could nearly replicate [its] current
racial composition without resorting to race-based practices" if
it increased tips for "socioeconomically disadvantaged applicants"
and eliminated tips for "children of donors, alumni, and faculty");
id. at 280 (Thomas, J., concurring) ("If an applicant has less
financial means (because of generational inheritance or
otherwise), then surely a university may take that into account.");
id. at 317 (Kavanaugh, J., concurring) (universities "'can, of
course, act to undo the effects of past discrimination in many
permissible ways that do not involve classification by race'")
(quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 526
(1989) (Scalia, J., concurring in the judgment)).

Granted, no concurring opinion expressly held that a
school may adopt a facially neutral admissions policy precisely
because it would reduce racial disparities in the student body as
compared to the population of eligible applicants.  But the message
is clear.  Justice Gorsuch, and indeed plaintiff Students for Fair
Admissions itself, identified use of socio-economic status
indicators -- i.e., family income -- as a tool for universities
who "sought" to increase racial diversity.  See id. at 299-300

(Gorsuch, J., with Thomas, J., concurring).  And Justice Kavanaugh wrote that "universities still 'can, of course, act <u>to undo</u> the effects of past discrimination in many permissible ways.'"  <u>Id.</u> at 317 (Kavanaugh, J., concurring) (emphasis added).

Nor is there any reason to suppose that these assurances do not apply to admission to selective public schools.  As Justice Kennedy wrote in his pivotal concurring opinion in <u>Parents Involved in Cmty. Schs.</u> v. <u>Seattle Sch. Dist. No. 1</u>, "[i]n the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition."  551 U.S. 701, 788 (2007) (Kennedy, J., concurring) (internal citation omitted).

Third, holding school officials liable for any reduction in the statistical over-representation of any racial group, merely because the change was the intended result of a new facially neutral and valid selection policy, would deter efforts to reduce unnecessary racial disparities.  A school might base admission on residence in geographical proximity to the school, on attendance at specific schools in a lower grade, on tests or GPA, or some combination of the myriad indicia of students' prior success.  A school might even decide to rely only on a lottery.  It hardly would be surprising to find that a change from one of those

selection criteria to another significantly altered the racial composition of the pool of successful applicants.

Nor would a lack of intent provide any safe harbor given that responsible school officials would likely attempt to predict the effects of admissions changes, if for no other reason than to avoid increasing disparities. And many honest school officials would admit that as between two equally valid selection criteria, they preferred the one that resulted in less rather than greater demographic disparities. In short, any distinction between adopting a criterion (like family income) notwithstanding its tendency to increase diversity, and adopting the criterion because it likely increases diversity, would, in practice, be largely in the eye of the labeler. Cf. Coal. for TJ, 68 F.4th at 882 (quoting Palmer, 403 U.S. at 224) ("If the law is struck down for [intent alone] . . . it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons.").

To be sure, in striking down Harvard and UNC's race-conscious plans in Students for Fair Admissions, the Supreme Court noted that "[w]hat cannot be done directly cannot be done indirectly," such that "universities may not simply establish through application essays or other means the regime [the Court found unlawful]." 600 U.S. at 230 (citation omitted). But we do not read that admonition as calling into question the use of a

- 28 -

bona fide, race-neutral selection criterion merely because it bears a marginal but significant statistical correlation with race.

Certainly, Justices Gorsuch, Thomas, and Kavanaugh, in joining the majority opinion, did not read the Court's opinion to foreclose use of the very selection criteria to which their concurrences pointed as permissible race-neutral alternatives to the race-conscious admissions programs before the Court.

Of course, at some point, facially neutral criteria might be so highly correlated with an individual's race and have so little independent validity that their use might fairly be questioned as subterfuge for indirectly conducting a race-based selection process.  In that event, nothing in this opinion precludes a person harmed by such a scheme from pursuing an equal protection claim under the authority of Students for Fair Admissions.  Here, though, admission under the Plan correlated positively with being White or Asian, the only groups numerically over-represented under the Plan.  And the Plan's prosaic selection criteria -- residence, family income, and GPA -- can hardly be deemed otherwise unreasonable.  Nor is this a case in which a school committee settled on and employed a valid selection criterion, and then simply threw out the results because the committee did not like the racial demographics of the individuals selected.

Thus, we find no reason to conclude that <u>Students for
Fair Admissions</u> changed the law governing the constitutionality of
facially neutral, valid secondary education admissions policies
under equal protection principles.  For such policies to merit
strict scrutiny, the challenger still must demonstrate (1) that
the policy exacts a disparate impact on a particular racial group
and (2) that such impact is traceable to an invidious
discriminatory intent.  See <u>Arlington Heights</u>, 429 U.S. at 264–
65; <u>see also</u> <u>Coal. for TJ</u>, 68 F.4th at 879; <u>Lower Merion Sch.
Dist.</u>, 665 F.3d at 549; <u>Hayden</u> v. <u>County of Nassau</u>, 180 F.3d 42,
48 (2d Cir. 1999); <u>Raso</u> v. <u>Lago</u>, 135 F.3d 11, 16 (1st Cir. 1998).

As we previously stated:

> [O]ur most on-point controlling precedent,
> <u>Anderson ex rel. Dowd</u> v. <u>City of Boston</u>, makes
> clear that a public school system's inclusion
> of diversity as one of the guides to be used
> in considering whether to adopt a facially
> neutral plan does not by itself trigger strict
> scrutiny.  <u>See</u> 375 F.3d at 85–87 (holding that
> strict scrutiny did not apply to attendance
> plan adopted based on desire to promote
> student choice, equitable access to resources
> for all students, and racial diversity).  In
> <u>Anderson</u>, we expressly held that "the mere
> invocation of racial diversity as a goal is
> insufficient to subject [a facially neutral
> school selection plan] to strict scrutiny."
> <u>Id.</u> at 87.

<u>Boston Parent I</u>, 996 F.3d at 46.  Our view has not changed.  There
is nothing constitutionally impermissible about a school district
including racial diversity as a consideration and goal in the

enactment of a facially neutral plan.  To hold otherwise would "mean that that any attempt to use neutral criteria to enhance diversity . . . would be subject to strict scrutiny." <u>Boston Parent I</u>, 996 F.3d at 48.

"The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is <u>not</u> like treating them differently because they are from a city or from a suburb . . . ." <u>Students for Fair Admissions</u>, 600 U.S. at 220.  So too here, treating students differently based on the zip codes in which they reside was not like treating them differently because of their skin color.

### C.

Because we find that the Plan is not subject to strict scrutiny, we would normally proceed to consider its constitutionality under rational basis review.  But the Coalition, for good reason, does not argue that the Plan fails rational basis review.  So we deem any such claim waived.

### IV.

Finally, the Coalition appeals the district court's denial of its motion under Federal Rule of Civil Procedure 60(b), which allows for relief from a final judgment in "exceptional circumstances . . . favoring extraordinary relief." <u>See Karak</u> v. <u>Bursaw Oil Corp.</u>, 288 F.3d 15, 19 (1st Cir. 2002).  We review the district court's denial of the Coalition's Rule 60(b) motion for

abuse of discretion.  <u>Fisher</u> v. <u>Kadant, Inc.</u>, 589 F.3d 505, 512 (1st Cir. 2009).

Pursuant to Rule 60(b), a "court may relieve a party . . . from a final judgment, order, or proceeding" based on, inter alia, "newly discovered evidence that, with reasonable diligence, could not have been discovered in time." Fed. R. Civ. P. 60(b)(2).  The newly discovered evidence to which the Coalition pointed was the text messages, discussed above, between Oliver-Dávila and Rivera, particularly their agreement that they were "[s]ick of westie whites."

"Under this rule, a party moving for relief . . . must persuade the district court that: (1) the evidence has been discovered since the trial; (2) the evidence could not by due diligence have been discovered earlier by the movant; (3) the evidence is not merely cumulative or impeaching; and (4) the evidence is of such a nature that it would probably change the result were a new trial to be granted." <u>González-Piña</u> v. <u>Rodríguez</u>, 407 F.3d 425, 433 (1st Cir. 2005) (internal quotation and citation omitted).  Here, the district court concluded, among other things, that the Coalition failed to meet the second and fourth requirements.  <u>See</u> <u>Bos. Parent Coal.</u>, 2021 WL 4489840, at *15-16.

As to the second requirement, the district court found that the Coalition failed to show that "the evidence could not by

due diligence have been discovered earlier." González-Piña, 407 F.3d at 433. The district court -- buttressed by its experience closely supervising this litigation and the parties' arguments along the way -- reasonably determined that the Coalition made a deliberate decision to forgo discovery, despite its apparent suspicion that the two School Committee members harbored racial animus, and even discouraged further development of the record at trial. Bos. Parent Coal., 2021 WL 4489840, at *15. The Coalition purportedly did so because it was, and remains, adamant that it did not need to make a showing of racial animus to prevail. See id. Additionally, the district court found that the School Committee's failure to disclose the text messages in its response to various third parties' public records requests did not constitute the kind of misconduct -- such as that occurring within the judicially imposed discovery process -- that warrants Rule 60(b) relief. See id. at *14. We see no abuse of discretion in any of these findings.

As to the fourth requirement, the district court found that the text-message evidence was not "of such a nature that it would probably change the result were a new trial to be granted," González-Piña, 407 F.3d at 433, principally on the grounds that the evidence did not rectify the Coalition's failure to make a proper showing of the Plan's disparate impact. See Bos. Parent Coal., 2021 WL 4489840, at *15-16. The district court did not

- 33 -

abuse its discretion in reaching this conclusion.  More evidence of intent does not change the result of this case, given that our analysis assumes that the Plan was chosen precisely to alter racial demographics.  We recognize that the text messages evince animus toward those White parents who opposed the Plan.  But the district court supportably found as fact that the added element of animus played no causal role that was not fully and sufficiently played by the motive of reducing the under-representation of Black and Latinx students.  Id. at *15.  In the district court's words, what drove the Plan's selection was the expected "increase in Black and Latinx students."  Id. (citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 258 (1979)) (distinguishing "action taken because of animus" from action taken "in spite of [its] necessary effect on a group") (emphasis in original).  So, we need not decide what to make of a case in which a school district took action to reduce a numerically over-represented group's share of admissions because of animus toward that group.

Consequently, we find that the district court did not abuse its discretion in denying the Coalition relief under Rule 60(b).

## V.

For the foregoing reasons, we affirm the district court's denial of the Coalition's motion under Rule 60(b), and its judgment rejecting the Coalition's challenges to the Plan.